IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA,<br>Office of the Governor<br>111 East Broad Street<br>Richmond, Virginia 23219<br><br>CITY OF VIRGINIA BEACH,<br>Office of the Mayor<br>Virginia Beach Municipal Center<br>Virginia Beach, Virginia 23456<br><br>       *Plaintiffs*,<br><br>v.<br><br>THOMAS F. GIMBLE, in his official capacity as Acting<br>Inspector General, United States Department of Defense,<br>400 Army Navy Drive<br>Arlington, Virginia 22202<br><br>DONALD RUMSFELD, in his official capacity as<br>the Secretary of the United States Department of Defense,<br>1000 Defense Pentagon<br>Washington, DC 20301-1000<br><br>UNITED STATES DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington, DC 20301-1000<br><br>       *Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>  Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Commonwealth of Virginia and the City of Virginia Beach (together,

"Plaintiffs" or the "Virginia Jurisdictions"), by their undersigned attorneys, bring this action

against Thomas F. Gimble, in his official capacity as the Acting Inspector General of the United

States Department of Defense (the "Inspector General"), Donald Rumsfeld, in his official

capacity as the Secretary of the United States Department of Defense (the "Secretary"), and the

United States Department of Defense, and allege the following:

## OVERVIEW OF THE CASE

1.      This is an action to set aside a determination by the Inspector General pursuant to

an order of the President of the United States adopting the recommendation of the 2005 Defense

Base Closure and Realignment Commission ("Commission").  This order (the "BRAC Order" or

"Order") calls for the realignment of Naval Air Station Oceana ("NAS Oceana") in the City of

Virginia Beach, Virginia, by relocating the East Coast Master Jet Base from NAS Oceana to

Cecil Field in Jacksonville, Florida.

2.      By its terms, the BRAC Order was not to take effect unless the Virginia

Jurisdictions "fail[ed] to enact and enforce legislation to prevent further encroachment of Naval

Air Station Oceana by the end of March 2006."  The Order charged the Inspector General with

the responsibility to certify whether this condition was satisfied.

3.      To avert the relocation of the jet base, the Order required the Virginia

Jurisdictions to take action to "prevent further encroachment" around NAS Oceana.  The Order

then listed six specific actions to satisfy that requirement.  Key among these specific actions was

the requirement to expend $15 million per year on "a program to condemn and purchase all

incompatible use property" within Accident Potential Zone 1 ("APZ-1") at NAS Oceana (the

"APZ-1 condition").

4.      On March 31, 2006, the Virginia Jurisdictions submitted a report to the Inspector

General describing the various actions taken in response to the BRAC Order and demonstrating

that these actions met the terms of the Order (the "Compliance Demonstration Report").  With

respect to the APZ-1 condition, the Virginia Jurisdictions adopted state laws and local ordinances

to establish a program (the "APZ-1 Program") that not only prevents all further encroachment but also rolls back existing encroachment in all APZ-1 areas at NAS Oceana. The APZ-1 Program consists of three principal components:

(a)     a new zoning ordinance (the "APZ-1 Ordinance") which immediately halts all new incompatible development in APZ-1 by restricting land use in APZ-1 to uses that are designated "compatible" under the Navy's Air Installation Compatible Use Zones ("AICUZ") regulation (OPNAV Instruction 11010.36B);

(b)     an "APZ-1/Clear Zone Use and Acquisition Plan" which provides for the acquisition (including, in some cases, through condemnation) of certain properties that have been adversely affected by the APZ-1 Ordinance; and

(c)     an "Oceana Land Use Conformity Program" which combines a variety of tools, including property acquisition, tax and zoning incentives, and financial assistance, to convert pre-existing, non-conforming uses in APZ-1 to conforming uses under the APZ-1 Ordinance.

The APZ-1 Program is a demonstrably effective means for reducing encroachment at NAS Oceana consistent with good land use policy.

5.     On May 24, 2006, the Inspector General issued a final determination in which he concluded that the Virginia Jurisdictions had satisfied five of the six specific conditions of the BRAC Order, but had not satisfied the APZ-1 condition. The Inspector General's determination was based entirely on the fact that the APZ-1 Program did not require the condemnation of all 3400 existing homes and hundreds of existing businesses located within the APZ-1 areas around NAS Oceana. In effect, the Inspector General concluded that the only way the Virginia Jurisdictions could meet the terms of the BRAC Order was by forcing thousands of families to give up their homes -- most of which were built long before the Navy established Oceana as an air installation -- and eliminating many other existing non-residential property uses in APZ-1, including churches, recreational centers, and retail and office space. The Inspector General reached this conclusion despite the fact that these Draconian measures would be far less effective

in achieving the objective of the BRAC order -- preventing further encroachment around the installation -- than the APZ-1 Program adopted by the Virginia Jurisdictions.

6.      The Inspector General's determination fails to satisfy the fundamental requirements for federal agency action under the Administrative Procedure Act ("APA").  First, he failed to read the BRAC Order in a unified way that gave effect to all of its terms and took proper account of its structure.  Within the text of the Order, the APZ-1 condition is subordinate to the principal operative provision, which requires the Virginia Jurisdictions to take actions to "prevent further encroachment" around NAS Oceana.  The Inspector General's interpretation of the BRAC Order ignores the plain language of this operative provision.  Preventing further encroachment does not require the condemnation of existing homes and business.

7.      Second, the Inspector General's interpretation of the Order was contrary to the facts in the record.  When the BRAC Commission decided to use the term "incompatible use property" in the BRAC Order, it expressly stated that the term was to be understood by reference to the Navy AICUZ regulations and the Hampton Roads Joint Land Use Study "in order to make it clear to those who have to sort out what this means."  Under the AICUZ regulations as applied by the Navy at NAS Oceana and as reflected in the Navy's position in connection with the Joint Land Use Study, pre-existing homes and businesses are not considered "incompatible use property."  Disregarding the Commission's clear guidance about how that term was to be understood, the Inspector General concluded that he was required to base his decision on a table printed on the back of a 1999 AICUZ pamphlet showing the Defense Department's general recommendations for land use development around air installations, even though it was clear from the record that the reference to that pamphlet was included in the BRAC Order solely to define the boundaries of the APZ-1 areas at NAS Oceana.

8.      Finally, the Inspector General failed to interpret the BRAC Order in a manner consistent with its objective of preventing further encroachment around NAS Oceana.  The Compliance Demonstration Report documented that the APZ-1 Program would immediately achieve the objective of preventing further encroachment within APZ-1, whereas a program of individual condemnation actions to acquire existing homes and businesses at the rate of $15 million per year would not keep pace with new development, and thus would not "prevent further encroachment."  These facts were undisputed in the record.  The Inspector General simply ignored them, believing -- contrary to law -- that he was compelled to read the order in a manner that produced an irrational result.

9.      The Inspector General's determination is arbitrary and capricious and not in accordance with the law.  It should be set aside pursuant to section 706 of the APA, and this matter should be remanded to the Inspector General for reconsideration in accordance with the requirements of the APA.

## JURISDICTION AND VENUE

10.     This court has jurisdiction over this matter pursuant to the federal question statute, 28 U.S.C. §1331, and the APA, 5 U.S.C. §§ 101-796.  Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, by Rule 57 of the Federal Rules of Civil Procedure, and by the general legal and equitable powers of this Court.

11.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(e)(1) and (2) because at least one of the Defendants resides in the District of Columbia, and a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia.

**PARTIES**

12.     Plaintiffs: The Commonwealth of Virginia is a state within the United States of America.  The City of Virginia Beach is a municipality within the Commonwealth of Virginia.

13.     Each of the Plaintiffs will be harmed by the Inspector General's wrongful determination of noncompliance with the conditions of the BRAC Order because that determination allows the BRAC Order to take effect.  The BRAC Order calls for the realignment of NAS Oceana by relocating the East Coast Master Jet Base to Cecil Field in Jacksonville, Florida.  The relocation of the Master Jet Base will result in the loss to the Commonwealth and the City of Virginia Beach of approximately 12,000 jobs, as well as associated economic activity, such as procurement of supplies and services, generated by the operation of the jet base. The Commonwealth and the City of Virginia Beach will be directly and adversely affected by, among other circumstances, the loss of tax revenue attributable to the jobs, and other economic activity generated by the jet base, that will be transferred to Jacksonville.  The total lost tax revenue to the Commonwealth and the City of Virginia Beach will exceed $500 million.

14.     Defendant Thomas H. Gimble is sued in his official capacity as the Acting Inspector General of the Department of Defense.  The Inspector General is the head of the Office of Inspector General of the Department of Defense, which was established as an independent and objective unit of the Department of Defense by the Inspector General Act of 1978, codified at 5 U.S.C. App. § 1.  The Inspector General is the agency official expressly charged by the terms of the BRAC Order with the responsibility to determine whether the Virginia Jurisdictions met the requirements imposed on them by the Order in order to avert the realignment of NAS Oceana.

15.     Defendant Donald H. Rumsfeld is sued in his official capacity as the Secretary of the United States Department of Defense.  The Secretary's offices are located at 1000 Defense

Pentagon, Washington, D.C., 20301-1000.  The Secretary is obligated by law to implement base

closure and realignment orders issued by the President pursuant to the BRAC process.

16.    Defendant United States Department of Defense is an agency of the United States

government.

## FACTUAL BACKGROUND

### NAS Oceana

17.    NAS Oceana originally was established as an Auxiliary Airfield in 1940.  It

became a Naval Auxiliary Air Station in 1943, and a Naval Air Station in 1951.  NAS Oceana

was officially designated a Master Jet Base in 1957.

18.    Since its establishment in 1940, NAS Oceana has grown to more than sixteen

times its original size, with a total land area of 5,331 acres.  The Navy also owns restrictive

easements on 3,681 acres beyond the NAS Oceana boundary, purchased from private landowners

with Congressional authorization and funding.

### Navy Air Installation Compatibility Use Zone Program

19.    In 1973, the U.S. Department of Defense established the AICUZ Program to

address concerns about aircraft noise and accident potential.

20.    The Navy implements the AICUZ program through a Navy regulation known as

OPNAV Instruction 11010.36.  This regulation was first issued in 1979, and was revised in 1988,

and then again in 2002.

21.    Pursuant to OPNAV Instruction 11010.36, the Navy designates noise zones and

accident potential zones ("APZs") around its air installations.  The OPNAV Instruction defines

three APZs:  the Clear Zone, APZ-1, and APZ-2.  The Clear Zone extends 3,000 feet beyond the

runway; APZ-1 extends 5,000 feet beyond the Clear Zone; and APZ-2 extends 7,000 feet beyond APZ-1.

22.     The Navy first established an AICUZ map for NAS Oceana in March 1975, shortly after the introduction of the F-14 Tomcat aircraft.  The Navy has subsequently revised the map three times, in 1979, 1994, and 1999.

23.     The 1999 map substantially altered both the size and shape of the APZs to reflect the flight paths of the new F/A-18 Hornet aircraft.  The new APZs encompassed numerous residential and commercial developments that previously had not been located within any APZ.

24.     OPNAV Instruction 11010.36 includes general recommendations for compatible land uses within APZs and noise zones.  These recommendations are not binding on state and local governmental bodies, which exercise exclusive control over land use decisions.  Rather, they serve as guidelines to Navy installation command representatives for purposes of developing recommendations to state and local governments in connection with land use proposals.

25.     Under the OPNAV Instruction, the concept of compatibility may be defined in varying ways to reflect factual circumstances specific to each Naval air installation.  The OPNAV Instruction provides that the AICUZ study for each installation "shall include recommended land uses based on recognized guidelines and sound planning principles," and further provides that "[t]he recommendations regarding compatible land use within each zone may vary according to local conditions."

26.     Consistent with the concept that compatibility may be determined on a site-specific basis, the OPNAV Instruction includes a table providing "recommended" land use compatibility guidelines for APZs, but expressly provides that "[l]ocal planning & zoning

authorities may desire to implement different criteria than those included herein, to reflect specific local conditions." An installation may support such alternative criteria with approval from the Chief of Naval Operations.

27.    The OPNAV Instruction also addresses efforts by the Navy to limit incompatible development around air installations through the acquisition of property rights. The instruction states that "[u]nless unusual situations exist which would warrant the expense and disruption of 'trying to turn back the clock' in developed areas, the primary focus of these acquisition efforts is on undeveloped land."

28.    The areas around NAS Ocean began to develop well before the facility was designated as a Master Jet Base in 1957. Nearly one-third of the houses currently located in APZ-1 were built before 1952, and over half were built before 1975, when the Navy first defined AICUZ areas around NAS Oceana. Moreover, nearly all of the subsequent residential development was undertaken by right pursuant to zoning classifications that were in place prior to the AICUZ program.

29.    The Navy does not consider the existing development within APZ-1 to be incompatible with operations at NAS Oceana. The Navy's position in this regard was articulated in correspondence dated January 21, 2005, from Captain Thomas Keeley, Commanding Officer at NAS Oceana, to the City of Virginia Beach in connection with the 2005 Hampton Roads Joint Land Use Study. In that letter, Captain Keeley transmitted the Navy's "Position Map," which highlighted the Navy's position regarding development in different areas surrounding NAS Oceana. With respect to the area encompassing the Accident Potential Zones, Captain Keeley stated that this was an area "where further residential development should be prohibited and any redevelopment should be to the same or lower density." Captain Keeley's letter goes on to state:

"The developments in the APZ's are considered pre-existing non-conforming uses and are not NAS Oceana's number one priority" and that the Navy's "goal is to stop further incompatible encroachment."

30.     The Navy confirmed its position that existing development around NAS Oceana was not incompatible with the continued operation of the base in its testimony before the BRAC Commission.  Admiral Mullen, the Chief of Naval Operations, described the encroachment issue as "manageable" three times during a single hearing on August 4, 2005.

31.     The Navy's forward looking position with respect to land use compatibility around NAS Oceana is also confirmed by its own past practice, consistent with the OPNAV Instruction, of grandfathering existing non-conforming uses when it acquired restrictive easements on properties surrounding NAS Oceana.

**Hampton Roads Joint Land Use Study**

32.     Beginning in 2004, as part of a cooperative effort to manage development around NAS Oceana, the Cities of Virginia Beach, Chesapeake and Norfolk partnered with the Navy to conduct the Hampton Roads Joint Land Use Study ("JLUS").  The purpose of the JLUS was to develop recommendations regarding land use policies that would balance the community's interests with the military's mission.

33.     The final JLUS report was published in May 2005.  The report set out a number of specific recommendations for follow up action by the Cities of Virginia Beach and Chesapeake, including the adoption of an AICUZ overlay zoning district to impose restrictions on new development in noise zones and APZs.

34.     On May 10, 2005, the Virginia Beach City Council passed a resolution accepting the JLUS and directing the City staff to take appropriate measures to implement the study's recommendations.  On May 24, 2005, the Chesapeake City Council adopted a similar resolution.

35.     Admiral Mullen, the Chief of Naval Operations, endorsed the JLUS report in the following testimony before the Commission on August 4, 2005:

> I will say that the recent adoption by local communities along with the Navy of the 2005 Hampton Roads Joint Land Use Study recommendations is very encouraging.  I believe this study marks a point of departure.  It is about the future; not about the past.  If implemented by those governments, the study's recommendations would allow us all to work more closely together so as to prevent future incompatible growth.

**The Base Closure and Realignment Process**

36.     The BRAC Order was purportedly issued pursuant to the Defense Base Closure and Realignment Act of 1990, as amended, 10 U.S.C. §§ 2687 et seq. (the "BRAC Statute").[1]

37.     The BRAC Statute establishes a detailed procedure for the closure and/or realignment of military installations.  As part of this process, the Secretary must publish in the Federal Register and transmit to the Congressional defense committees and to the BRAC Commission a list of the military installations inside the United States that the Secretary recommends for closure or realignment. 10 U.S.C. § 2687, Section 2903(c).

38.     After receiving the recommendations from the Secretary, the Commission is required to conduct public hearings on such recommendations.  The Commission then transmits to the President of the United States a report containing the Commission's findings and conclusions based on a review and analysis of the recommendations made by the Secretary, together with the Commission's recommendations for closure or realignment of military installations inside the United States.  10 U.S.C. § 2687, Section 2903(d)(2)(A).

39.     If the President approves all of the Commission's recommendations, he must transmit the recommendations to Congress, together with a certification of such approval.  10 U.S.C. § 2687, Section 2903(e).

40.     The Secretary is required to close all military installations recommended for closure by the Commission and approved by the President.  The Secretary is further required to realign all military installations recommended for realignment by the Commission and approved by the President. 10 U.S.C. § 2687, Section 2904(a)(1)-(2).

### The BRAC Order

41.     Pursuant to the BRAC Statute, the Secretary submitted his recommendations for closure and realignment of military installations to the BRAC Commission on May 13, 2005. Out of 318 bases, the Secretary recommended that 33 military installations be closed and that 29 others be realigned.  The Secretary did not recommend any closure or realignment with respect to NAS Oceana.

42.     During a hearing before the Commission on July 18, 2005, the Navy reiterated its position that it had fully considered, and rejected, alternative locations for the East Coast Master Jet Base.  Admiral Robert Willard, Vice Chief of Naval Operations, testified that "a lot of view [went] into potential alternatives -- and frankly, Oceana continues to be the Navy's best option for its Master Jet Base on the East Coast."  Admiral Willard also testified that "from the Navy's vantage point, we believe that Oceana continues to serve the fleet well, that the challenges that you mention regarding encroachment at Oceana have been and are manageable."

---

[1] In a companion suit filed this date, Plaintiffs allege that the BRAC Order exceeded the President's authority under the BRAC Statute and otherwise was issued in violation of law.

43.    On July 19, 2005, the Commission voted to add eleven military installations for consideration for closure, realignment or further realignment.  NAS Oceana was among the installations added to the list.

44.    At the suggestion of several members of the Florida Congressional delegation, the Commission subsequently solicited and received commitments from Jeb Bush, Governor of Florida, and John Peyton, Mayor of the City Jacksonville, that they supported the relocation of the East Coast Master Jet Base to Cecil Field, and that they were prepared to relocate existing commercial tenants at the Cecil Field complex and transfer title to the property back to the Department of Defense.  Cecil Field had formerly operated as a Naval Air Station but was closed in 1999 pursuant to an order issued during the 1993 BRAC process.

45.    On August 20, 2005, the Commission held a hearing regarding the proposed realignment of NAS Oceana.  During this hearing, Terrie Suit, a member of the Virginia House of Delegates, presented the Commission with an outline of draft legislation to address encroachment at NAS Oceana.  She described the six key provisions of that legislation as follows:

> [W]e have state-mandated zoning controls to address future zoning changes and keep them in compliance with the OPNAV instructions.  We have a comprehensive requirement to change zoning where it is constitutionally viable to do so.  We have a purchase-of-development-rights program in the accident potential zone to take care of purchasing from willing sellers properties that are in conflict -- that are already zoned but are in conflict with the OPNAV instruction.  We have an inter-facility traffic area purchase-of-development-rights program. . . .  We have legislative staff reviewing all of the recommendations from the Joint Land Use Study that was done over the last two years with the Navy, and we're going to be identifying and codifying any additional items that we possibly can out of that study.  And we have a very successful in Virginia military advisory council with members of the different bases and installations that works closely with our elected members on issues that are important to the military.  And as a subgroup of that, legislatively we will create an Oceana-Fentress Advisory Council consisting of members of council, COMNAV mid-Atlantic region, the CO of Oceana, and the legislative general assembly members who represent those

installations, so that we can continue ongoing dialogue and make sure that we are addressing future issues on a consistent basis.

This draft legislation was designed to "provide permanency to these encroachment-curtailing policies that the city is moving forward."

46.    On August 24, 2005, the Commission voted to add NAS Oceana to the list of military installations recommended for closure or realignment.  In response to the commitments made during the August 20 hearing by Delegate Suit and other representatives of the Virginia Jurisdictions, the realignment recommendation was conditional upon the Virginia Jurisdictions failing to take actions by March 31, 2006, to prevent further encroachment around the base.[2]

47.    The Commission's recommendation listed six specific conditions to satisfy the requirement to prevent further encroachment.  As originally adopted on August 24, the second of these conditions read as follows: "enact state and local legislation and ordnance [sic] to establish a program to condemn and purchase all the property located within accident potential zone 1 areas for Naval Air Station Oceana, as depicted for [sic] 1999 AICUZ pamphlet published by the U.S. Navy."  The reference to the 1999 AICUZ pamphlet served only to define the boundaries of the APZ-1 areas at NAS Oceana within which this condition was to apply.

48.    During the Commission's deliberation on August 26, 2005, Commissioner Hill pointed out that the reference to "all property" in the recommendation adopted on August 24 was overbroad.  In the following exchange, the Commission decided to modify the APZ-1 condition to identify more clearly the specific property to which it was to apply:

Commissioner Hill:          Mr. Chairman, as a matter of specificity when we
                            did this motion and it's the sixth dot, the paragraph

---

[2]  In addition, the Commission's recommendation provided that the State of Florida and the City of Jacksonville must, by December 31, 2006, turn over title to Cecil Field in fee simple to the Department of Defense by December and appropriate sufficient funds to relocate commercial tenants currently occupying Cecil Field and to secure public-private ventures for all personnel housing required by the Navy to accomplish the relocation of the East Coast Master Jet Base.

starts: Enact state and local legislation in order to establish a program to condemn and purchase all the property. That sentence is more correctly read, purchase all the nonconforming property located within all the accident potential Zone 1. We're asking way to much of them if they purchase all the property. It should be in fact, all the nonconforming property, in fairness."

Commissioner Skinner:    So we're going to amend by adding the word nonconforming?

Commissioner Hill:    That is correct. Just add nonconforming.

Commissioner Bilbray:    Mr. Chairman, we're not supposed to discuss when we recuse, but nonconforming as to what?

Bill Fetzer:[3]    Mr. Chairman, in the AICUZ manual and also the JLUS, the terms are incompatible use rather than nonconforming. So I think in order to make it clear to those who have to sort out what that means I would say incompatible use, rather than nonconforming.

Chairman Principi:    Commissioner Hill?

Commissioner Hill:    Terrific.

49.    As revised as a result of the Commission's deliberations on August 26, the final APZ-1 condition read as follows: "enact state and local legislation and ordnance [sic] to establish a program to condemn and purchase all the incompatible use property located within the Accident Potential Zone 1 areas for Naval Air Station Oceana, as depicted in the 1999 AICUZ pamphlet published by the U.S. Navy and to fund and expend no less than $15 million annually in furtherance of the aforementioned program."

50.    The Commission also amended the recommendation on August 26, 2005, to add the following statement: "it shall be deemed that the actions prescribed to be taken by the Commonwealth of Virginia, and the Cities of Virginia Beach, and Chesapeake respectively, by

the end of March 2006 have not been taken in their entirety, unless the Comptroller General of

the Government Accountability Office so certifies in writing to the President and oversight

committees of Congress by June 1, 2006."

51.     Prior to the submission of the Commission's report of its recommendations to the

President, the Commission staff deleted the language "Comptroller General of the Government

Accountability Office" and inserted in its place the language "Department of Defense Inspector

General."  The Commission's report to the President explained this revision as follows: "The

language that would have required the Comptroller General to certify the fulfillment of the

conditions established by this recommendation conflicted with *Bowsher v. Synar*, 478 U.S. 714

(1986), and *INS v. Chadha*, 462 U.S. 916 (1983)."

52.     The Commission submitted its Final Report to the President on September 8,

2005, including the recommendation to realign NAS Oceana by relocating the East Coast Master

Jet Base to Cecil Field.

53.     On September 15, 2005, the President approved the Commission's Final Report,

and transmitted the Commission's recommendations to Congress, along with a certification of

his approval thereof.

54.     Congress took no action within the time provided under the BRAC Statute to

disapprove of the Commission's recommendations.  As a result, unless the order is ruled to be

invalid, the Secretary is now obligated by the BRAC Statute to implement the BRAC Order.

**The Virginia Jurisdictions' Compliance Program**

55.     In response to the BRAC Order, the Virginia Jurisdictions enacted state laws and

local ordinances by March 31, 2006, to prevent further encroachment at NAS Oceana, including

---

[3] Mr. Fezter was a senior analyst on the Commission's staff.

the establishment of "a program to condemn and purchase all incompatible use property" in

APZ-1.

56.     On March 30, 2006, the Commonwealth of Virginia enacted legislation imposing

the following requirements as a matter of state law:

> For the purpose of preventing further encroachment, the governing body of any
> locality in which a United States Navy Master Jet Base is located shall adopt
> ordinances to establish a program to purchase or condemn pursuant to § 2,
> incompatible use property or otherwise seek to convert such property to an
> appropriate compatible use and to prohibit new uses or development deemed
> incompatible with air operations in the Accident Potential Zone 1 (APZ-1) and
> Clear Zone areas, as depicted in the Navy's 1999 AICUZ Pamphlet, and fund and
> expend no less than $15 million annually in state and local funds in furtherance of
> the program, to the extent that properties or development rights are reasonably
> available for acquisition or their use reasonably may be converted. Such funding
> and expenditures shall be subject to annual appropriations from the state and
> locality, and shall continue until such time as all reasonably available properties
> or development rights have been acquired in the designated areas.

57.     In accordance with this legislation, the City of Virginia Beach adopted ordinances

and implementation plans establishing the APZ-1 Program, which both prevents further

encroachment and rolls back existing encroachment in APZ-1. The APZ-1 Program consists of

three principal components: (1) an "APZ-1 Ordinance" that immediately halts all new

incompatible development in APZ-1 by restricting land uses to those that are designated

"compatible" under the Navy AICUZ guidelines, (2) an "APZ-1 and Clear Zone Use and

Acquisition Plan" that provides for the acquisition of certain properties that have been adversely

affected by the APZ-1 Ordinance, and (3) an "Oceana Land Use Conformity Program" that

combines a variety of tools, including property acquisition, tax and zoning incentives, and

financial assistance, to convert pre-existing, non-conforming uses in APZ-1 to conforming uses.

58.    The APZ-1 Ordinance was adopted unanimously by the Virginia Beach City
Council on December 20, 2005.  The APZ-1 Ordinance amends the applicable provisions of the
City Zoning Ordinance to provide as follows:

> No use or structure shall be permitted on any property located within Accident
> Potential Zone 1 (APZ-1) unless such use is designated as Compatible in APZ-1
> in Table 2 ("Air Installations Compatible Use Zones Land Use Compatibility in
> Accident Potential Zones") of Section 1804; provided, however, that any use or
> structure not designated as Compatible shall be permitted as a replacement of the
> same use or structure if the replacement use or structure is of equal or lesser
> density or intensity than the original use or structure.

Th APZ-1 Ordinance was revised in February 2006 to include the Clear Zones in addition to the
APZ-1 areas.

59.    The referenced Section 1804 is part of the City's new AICUZ Overlay Ordinance,
which was adopted on the same date as the APZ-1 Ordinance.  "Table 2" of Section 1804
corresponds to Table 3 of OPNAV Instruction 11010.36B -- "Suggested Land Use Compatibility
In Accident Potential Zones."  Thus, the prohibited uses under the APZ-1 Ordinance are tied
directly to the Navy's compatible use recommendations under its AICUZ regulation.

60.    The Virginia Beach City Council adopted the APZ-1 Use and Acquisition Plan
("APZ-1 Acquisition Plan") on December 20, 2005.  The plan was revised in February 2006 to
include the Clear Zones in addition to the APZ-1 areas.

61.    The APZ-1 Acquisition Plan consists of three elements: (1) acquisition by the
City of properties that are left without a reasonable use as a result of the restrictions imposed by
the APZ-1 Ordinance, including in some cases by means of condemnation actions pursuant to
authority granted to the City by the Commonwealth's BRAC legislation; (2) acquisition by the
City, at the request of the owner, of property that is zoned for duplex use but currently developed
with a single-family residence (*i.e.*, property that could have been developed as a duplex by right

prior to the adoption of the APZ-1 Ordinance); and (3) acquisition by the City, at the request of the owner, of non-residential property that is currently developed with a use that is non-conforming under the APZ-1 Ordinance (*i.e.*, property whose existing use could have been expanded by right prior to the adoption of the APZ-1 Ordinance).

62.    The City prepared an implementation manual for the APZ-1 Acquisition Plan and is proceeding to implement the plan.  On February 15, 2006, the City mailed notices to all property owners in APZ-1 describing the new property acquisition program and inviting them to participate in the program.

63.    On March 28, 2006, the Virginia Beach City Council adopted an ordinance establishing the Oceana Land Use Conformity Program ("Conformity Program").  The purpose of the Conformity Program is to encourage, incentivize and guide the conversion of non-conforming use properties in APZ-1 to conforming uses by means of a variety of tools, including property acquisition, tax incentives, zoning incentives, and financial assistance.  At the same time, the City Council adopted an amendment to the City's Comprehensive Plan to acknowledge and incorporate the Conformity Program.

64.    The Conformity Program will be administered by the Oceana Land Use Conformity Committee.  The Committee consists of certain Virginia Beach City officials and citizens, as well as a representative from the Navy, and is supported by staff from the Virginia Beach Department of Economic Development and the City Attorney's Office.

65.    The Committee is authorized and directed to develop and present recommendations to the City Council and the Virginia Beach Development Authority regarding specific property transactions or changes in law that will result in the conversion of non-conforming uses to conforming uses under the APZ-1 Ordinance.

66.    As part of the Conformity Program, the Virginia Beach City Council adopted a series of ordinances on March 28, 2006, that provide significant financial and regulatory incentives to promote the conversion of non-conforming use properties in APZ-1 to conforming uses.  These ordinances:

- amend the City zoning ordinance to eliminate the need for a conditional use permit for any conforming use otherwise allowed in the applicable zoning district; that is, such uses can be developed without review and approval by the City Council;

- create a "business opportunity zone" within APZ-1 that provides (a) a 90% rebate of the Business and Occupational License tax for a period of 15 years for any new compatible use in APZ-1, and (b) reimbursement of fees for building permits, site plan applications, and water and sewer connections;

- establish an APZ-1 "Property Tax Exemption District" that provides a 15-year tax abatement for the rehabilitation, renovation or replacement of commercial or industrial improvements resulting in the conversion of a non-conforming use to a conforming use; and

- amend the Economic Development Incentive Program to provide financial incentives to promote conversion of non-conforming use properties in APZ-1 to conforming uses.

67.    On March 31, 2006, the Virginia Jurisdictions submitted a multi-volume Compliance Demonstration Report to the Inspector General.  This report described and documented each of the various actions taken by the Virginia Jurisdictions in response to the BRAC Order, and provided a detailed analysis demonstrating that these actions met the terms of the BRAC Order.

68.    The Compliance Demonstration Report explained that the APZ-1 condition must be interpreted in light of the requirement to "prevent further encroachment" as stated in the operative provision of the BRAC Order, as well as the Navy's position that existing homes and businesses in the APZ-1 areas at NAS Oceana are not considered "incompatible use" as that term is used in the BRAC Order.

69.    The Compliance Demonstration Report documented the Commission's deliberations leading to the amendment of its original recommendation to add the term "incompatible use property" and documented the fact that the Commission understood that it was using the Navy's terminology and intended for that term to be interpreted in a manner consistent with the Navy's practice under its AICUZ regulation -- OPNAV Instruction 11010.36 -- as well as with the Navy's position in connection with the Joint Land Use Study.

70.    The Compliance Demonstration Report explained that the APZ-1 Ordinance alone was sufficient to satisfy the APZ-1 condition. To "prevent further encroachment" within APZ-1 areas, a condemnation program need only provide for the acquisition of easements that preclude new incompatible land use. The APZ-1 Ordinance was the equivalent of condemning such easements on *all* privately owned property in APZ-1. Had the City sought to achieve the same result through individual judicial condemnation actions rather than through the exercise of the City's authority to regulate land use, it would have been required to pay compensation of more than $100 million (in 2005 dollars) for the equivalent easement rights, and the process would have taken more than a decade at the rate of $15 million per year, during which time new incompatible uses would have continued to develop by right. In contrast, the APZ-1 Ordinance immediately achieved the objective of the BRAC Order by halting all new incompatible land use in APZ-1 areas.

71.    The Compliance Demonstration Report also documented that a program that relied solely on the condemnation of existing homes and businesses at the rate of $15 million per year would not keep pace with new incompatible development or land use. Due to the diminishing purchasing power of the $15 million annual expenditure, even after 100 years, such

a program would not have reduced the extent of potential incompatible land use in APZ-1 to the level achieved immediately by the APZ-1 Ordinance alone.

**The Inspector General's Certification Decision**

72.    On May 22, 2006, representatives from the Virginia Jurisdictions met with the Inspector General and members of his staff.  During this meeting, counsel for the Virginia Jurisdictions outlined the legal standards governing the Inspector General's decision and explained the Inspector General's obligation as a federal agency official implementing an order of the President to read the order in a unified way that gave proper effect to all of its terms and was faithful to the objectives of the order.

73.    On May 24, 2006, the Inspector General delivered a letter to the Chairman of the Senate Armed Services Committee in which he stated that the Virginia Jurisdictions "have implemented a number of commendable actions" but that he was "not able to certify full compliance with the BRAC criteria" because he concluded that such actions did not satisfy the APZ-1 condition.

74.    Enclosure 2 to the Inspector General's letter was a 13-page document entitled "2005 Defense Base Closure and Realignment Commission Report Criteria and Description of Findings and Results."  Under the heading "Findings and Results," this document stated that it provided a summary of the "2005 Defense BRAC Report Criteria as defined in Recommendation #193 of the Report; actions taken by the Commonwealth of Virginia (Commonwealth) and the municipal governments of Virginia Beach and Chesapeake, Virginia, (municipal governments) as identified in the Virginia Compliance Demonstration Report; and a determination whether the actions satisfied the BRAC criteria."

75.    Contemporaneously with the delivery of his letter to the Chairman of the Senate Armed Services Committee, the Inspector General gave a briefing to members of the Virginia Congressional delegation, the Governor of Virginia, members of the Virginia General Assembly, the Mayor and Vice Mayor of the City of Virginia Beach, and members of the Chesapeake City Council, in which he further explained the basis for his determination.

76.    As explained both in the Findings and Results document and during the May 24 briefing, the Inspector General's determination was based on the erroneous conclusion that the APZ-1 condition could be satisfied only through the acquisition of existing homes and businesses by means of judicial condemnation proceedings.  In reaching this conclusion, the Inspector General misread the BRAC Order by ignoring key provisions and assigning incorrect meanings to others.

77.    The Inspector General erred by interpreting the APZ-1 condition in a manner that failed to give effect to every provision of the Order, as required by law.  The Inspector General arbitrarily focused on the text of the APZ-1 condition in isolation, and improperly ignored the language of the operative provision of the order -- "prevent further encroachment" -- that plainly belies his conclusion that the language of the BRAC order "unambiguously" required the condemnation of existing homes and businesses.  At the same time, the Inspector general adopted a rigid interpretation of the phrase "purchase and condemn" to mean only the acquisition of property by means of an involuntarily judicial proceeding pursuant to eminent domain authority, even though that phrase has no commonly understood technical meaning, and under Virginia law property cannot be condemned through a judicial proceeding unless there has first been a good faith effort to acquire the property through a voluntary purchase and sale transaction.

78.     The Inspector General also erred by interpreting the phrase "incompatible use property" by reference to the 1999 AICUZ pamphlet for NAS Oceana.  The record before the Inspector General demonstrated unequivocally that the BRAC Commission intended that the term "incompatible use property" as used in the APZ-1 condition should be understood by reference to the Navy's practice pursuant to the OPNAV Instruction and the Navy's position in connection with the Joint Land Use Study.  The record further made clear that the reference to the 1999 AICUZ pamphlet was solely intended to define the boundaries of the APZ-1 areas within which the condition was to apply.

79.     The Inspector General not only disregarded the Commission's clear guidance regarding the meaning of this critical term, but he also failed even to acknowledge the facts in the record regarding the Commission's deliberations on this point, let alone provide a reasoned explanation for disregarding these facts.

80.     The facts in the record show that, under the AICUZ regulations as applied by the Navy at NAS Oceana and as reflected in Navy's position in connection with the Joint Land Use Study, pre-existing homes and businesses are not considered "incompatible use property."  The Inspector General's disregard of these facts led directly to his erroneous conclusion that the APZ-1 condition required the condemnation of existing homes and businesses.

81.     Finally, the Inspector General failed to interpret the BRAC Order in a manner consistent with its objective of preventing further encroachment around NAS Oceana.  The Compliance Demonstration Report documented that the APZ-1 Program would immediately achieve the objective of preventing further encroachment in APZ-1 areas and that, in contrast, a program consisting of individual condemnation actions to acquire existing homes and businesses

at the rate of $15 million per year would not keep pace with new development, and thus would not "prevent further encroachment." The Inspector General did not dispute these findings.

82.    The Inspector General also did not dispute that the condemnation of existing homes and businesses would have serious negative social consequences. As explained in the Compliance Demonstration Report, condemnation of existing homes and businesses would be inconsistent with the fundamental fairness principle of land use regulation that existing, non-conforming uses are allowed to remain when new land use requirements are imposed, it would result in an enormous waste of resources to demolish thousands of serviceable houses and other improvements, and it would seriously disrupt the lives of persons who would be forced to move from their homes or businesses.

83.    During the May 24 briefing, the Inspector General stated that he believed he was not authorized to exercise any judgment or discretion in interpreting the order so as to avoid an irrational result, and that he therefore made no attempt to consider whether his interpretation of the order was consistent with the objective of preventing further encroachment at NAS Oceana, and he took no account of the serious negative social consequences that would result from the condemnation of existing homes and businesses.

## FIRST CAUSE OF ACTION

**(Violation of Administrative Procedure Act; failure to interpret and apply the BRAC Order in a unified manner that gives proper effect to its operative terms)**

84.    The Plaintiffs reallege and incorporate all other allegations contained in this Complaint as if fully set forth herein.

85.    Under the Administrative Procedure Act, the Court must set aside agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

86.     The Inspector General has a legal obligation to interpret and apply the BRAC Order in a unified manner that gives proper effect to all of its terms and takes proper account of its structure.

87.     According to the BRAC Order, to avert the relocation of the East Coast Master Jet Base, the Virginia Jurisdictions were required to take action to "prevent further encroachment" around NAS Oceana.

88.     The Inspector General's interpretation of the BRAC Order to require condemnation of existing homes and businesses within APZ-1 failed to give effect to the primary operative requirement to "prevent further encroachment" and improperly gave precedence to a subordinate term of the Order.

89.     The Inspector General's determination of noncompliance was therefore arbitrary and capricious and not in accordance with law, and must be set aside.

## SECOND CAUSE OF ACTION

### (Violation of Administrative Procedure Act; failure to interpret and apply the BRAC Order in a manner consistent with the facts in the record)

90.     The Plaintiffs reallege and incorporate all other allegations contained in this Complaint as if fully set forth herein.

91.     Under the Administrative Procedure Act, the Court must set aside agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

92.     An agency action is arbitrary and capricious if it is not consistent with facts in the record.

93.     The Inspector General's interpretation of the term "incompatible use property" by reference to the 1999 AICUZ pamphlet was contrary to the expressly stated intention of the BRAC Commission that the term should be interpreted by reference to the Navy's AICUZ

regulations and the Navy's position in connection with the Hampton Roads Joint Land Use Study.

94.    Notwithstanding the fact that Plaintiffs raised this point in the materials they submitted for the record, the Inspector General failed to provide any justification for disregarding the Commission's clear statement of intent regarding the meaning of the term "incompatible use property."

95.    The Inspector General's determination of noncompliance was therefore arbitrary and capricious and not in accordance with law, and must be set aside.

### THIRD CAUSE OF ACTION

**(Violation of Administrative Procedure Act; failure to interpret and apply the BRAC Order in a rational manner consistent with its objective)**

96.    The Plaintiffs reallege and incorporate all other allegations contained in this Complaint as if fully set forth herein.

97.    Under the Administrative Procedure Act, the Court must set aside agency action that is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

98.    The Inspector General has a legal obligation to interpret and apply the BRAC Order in a rational manner consistent with its objectives.

99.    The objective of the order was to prevent further encroachment around NAS Oceana.  The undisputed facts in the record establish that the APZ-1 program immediately achieved that objective by halting all new incompatible development, whereas a condemnation only approach would not prevent further encroachment.

100.    The Inspector General took no account of these practical consequences in making his compliance determination and thus entirely failed to consider an important aspect of the problem that the BRAC Order sought to address.

101.    As a result, the Inspector General's reading of the BRAC Order is irrational because it would frustrate the objective of the order.

102.    The Inspector General's determination of noncompliance was therefore arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law, and must be set aside.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray that this Court issue an order granting the following relief:

A.    A declaration that the Inspector General's determination was arbitrary and capricious and not in accordance with law;

B.    A declaration that the BRAC Order does not require the condemnation of existing homes and businesses but requires only measures to prevent future encroachment around NAS Oceana.

C.    An order remanding the matter to the Inspector General for reconsideration in a manner consistent with the Administrative Procedure Act and the foregoing declaration regarding the requirements of the BRAC Order;

D.    An order enjoining the Secretary of Defense and the Department of Defense from implementing the BRAC Order pending the Inspector General's determination on remand;

E.    An award of attorneys' fees and the costs and expenses of this litigation; and

F.    Such other relief as the Court may deem appropriate.

Dated:  November 7, 2006                    Respectfully submitted,


Eric J. Murdock (D.C. Bar No. 443194)
David J. DePippo (D.C. Bar No. 484781)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, DC 20006
(202) 955-1500

Counsel for Plaintiffs
**COMMONWEALTH OF VIRGINIA**
**CITY OF VIRGINIA BEACH**

Of Counsel:

Robert F. McDonnell
Attorney General
Commonwealth of Virginia
900 East Main Street
Richmond, Virginia 23219
(804) 786-3808

Leslie L. Lilley
City Attorney
Office of the City Attorney
Virginia Beach Municipal Center
Virginia Beach, Virginia 23456-9115
(757) 385-4531

06-1908
RMU

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

**I (a) PLAINTIFFS**

Commonwealth of Virginia, City of Virginia Beach

98880

**DEFENDANTS**

Thomas Gimble, in his official capacity as Acting Inspector General, U.S.
Dept. of Defense, Donald Rumsfeld, in his official capacity as the
Secretary of the U.S. Dept. of Defense, and the U.S. Dept. of Defense

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

88888

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Eric J. Murdock, David J. DePippo
Hunton & Williams LLP; 1900 K Street, N.W.;
Washington, D.C. 20006
(202) 955-1500

ATTO

CASE NUMBER   1:06CV01908

JUDGE: Ricardo M. Urbina

DECK TYPE: Administrative Agency Review

DATE STAMP: 11/07/2006

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

◉ 2 U.S. Government
Defendant

○ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSE
FOR PLAINTIFF A

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/
Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

◉ **C. Administrative Agency
Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)
**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If
Administrative Agency is Involved)

○ **D. Temporary Restraining
Order/Preliminary
Injunction**

Any nature of suit from any category may
be selected for this category of case
assignment.

*(If Antitrust, then A governs)*

○ **E. General Civil (Other)**       OR       ○ **F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or
defendant
☐ 871 IRS-Third Party 26
USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
Exchange
☐ 875 Customer Challenge 12 USC
3410
☐ 900 Appeal of fee determination
under equal access to Justice
☐ 950 Constitutionality of State
Statutes
☐ 890 Other Statutory Actions (if
not administrative agency
review or Privacy Act

5

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ **530 Habeas Corpus-General** <br> ☐ **510 Motion/Vacate Sentence** | ☐ **442 Civil Rights-Employment** (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation) <br><br> *(If pro se, select this deck)* | ☐ **895 Freedom of Information Act** <br> ☐ **890 Other Statutory Actions** (if Privacy Act) <br><br> *(If pro se, select this deck)* | ☐ **152 Recovery of Defaulted Student Loans** (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ **710 Fair Labor Standards Act** <br> ☐ **720 Labor/Mgmt. Relations** <br> ☐ **730 Labor/Mgmt. Reporting & Disclosure Act** <br> ☐ **740 Labor Railway Act** <br> ☐ **790 Other Labor Litigation** <br> ☐ **791 Empl. Ret. Inc. Security Act** | ☐ **441 Voting (if not Voting Rights Act)** <br> ☐ **443 Housing/Accommodations** <br> ☐ **444 Welfare** <br> ☐ **440 Other Civil Rights** <br> ☐ **445 American w/Disabilities-Employment** <br> ☐ **446 Americans w/Disabilities-Other** | ☐ **110 Insurance** <br> ☐ **120 Marine** <br> ☐ **130 Miller Act** <br> ☐ **140 Negotiable Instrument** <br> ☐ **150 Recovery of Overpayment & Enforcement of Judgment** <br> ☐ **153 Recovery of Overpayment of Veteran's Benefits** <br> ☐ **160 Stockholder's Suits** <br> ☐ **190 Other Contracts** <br> ☐ **195 Contract Product Liability** <br> ☐ **196 Franchise** | ☐ **441 Civil Rights-Voting** (if Voting Rights Act) |

**V. ORIGIN**

◉ **1 Original Proceeding**   ○ **2 Removed from State Court**   ○ **3 Remanded from Appellate Court**   ○ **4 Reinstated or Reopened**   ○ **5 Transferred from another district (specify)**   ○ **6 Multi district Litigation**   ○ **7 Appeal to District Judge from Mag. Judge**

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**

Action pursuant to Administrative Procedure Act  5 USC 101, et seq. to review compliance determination by Dept. of Defense Inspector General

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   **DEMAND $**  _____   Check YES only if demanded in complaint
**JURY DEMAND:**   YES ☐   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☒   NO ☐   If yes, please complete related case form.

DATE  **11/7/2006**     SIGNATURE OF ATTORNEY OF RECORD   _[signature]_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.